## UNITED STATES
### v.
### RADIO CORPORATION OF AMERICA et al.
### Equity No. 793.

United States District Court
D. Delaware.
Jan. 11, 1954.

Leonard G. Hagner, U. S. Attorney, Wilmington, Del., Malcolm A. Hoffman, New York City, Bernard M. Hollander, Washington, D. C., and Daniel Reich, New York City, Sp. Assts. to the Atty. Gen., for United States.

Caleb S. Layton, Wilmington, Del. (of Richards, Layton & Finger, Wilmington, Del.), John T. Cahill, Paul W. Williams, Robert L. Werner, Loftus E. Becker, John W. Nields, and Dudley B. Tenney, New York City, of Cahill, Gordon, Zachry & Reindel, New York City, for Radio Corporation of America, et al.

John J. Morris, Jr., Wilmington, Del., of Morris, James, Hitchens & Williams, Wilmington, Del., Whitney North Seymour, New York City, Everett L. Hollis, Robert M. Estes, Syracuse, N. Y., Albert C. Bickford, Thomas Thacher, New York City, and Robert W. Bjork, Yonkers, N. Y., of Simpson, Thacher & Bartlett, New York City, for General Electric Co.

William Prickett, Wilmington, Del., Donald C. Swatland, George B. Turner, New York City, of Cravath, Swaine & Moore, New York City, for Westinghouse Electric Corp.

MARIS, Circuit Judge.

There is now before me for determination a motion by defendant General Electric Company (General Electric) for the construction and enforcement of the consent decree entered on November 21, 1932 in this anti-trust suit brought by the Government in 1930 against Radio Corporation of America, General Electric Company, Westinghouse Electric & Manufacturing Company (now Westinghouse Electric Corporation), American Telephone & Telegraph Company, Western Electric Company, General Motors Corporation, General Motors Radio Cor-

poration and a number of subsidiary corporations, all of whom were engaged in phases of the radio industry. The motion has been joined in by Westinghouse Electric Corporation (Westinghouse). It was supported by the Government at argument. Radio Corporation of America (RCA) strongly opposes the motion and has moved to dismiss it.

The Government had charged in its petition, among other things, that certain agreements among the defendants entered into between 1919 and 1930 restrained competition in the radio field by restricting the defendants' freedom of exercise of their respective patent rights and, also, that one of these agreements, entered into in 1930, had as its object further restraint of such competition by transferring General Electric and Westinghouse radio manufacturing facilities to RCA in return for stock in RCA. The Government asked for termination of these agreements and for divestiture of the transferred facilities and stock.

On November 21, 1932 the Government's motion to dismiss the suit as to American Telephone & Telegraph Company, Western Electric Company, General Motors Corporation and General Motors Radio Corporation was granted. On that day the Government and the sole remaining defendants, RCA, General Electric and Westinghouse, presented to the court a stipulation for the settlement and termination of the suit. By that stipulation it was agreed, among other things, that General Electric and Westinghouse would divest themselves of their holdings of RCA stock, that the patent license relations between RCA, General Electric and Westinghouse would be changed from the existing ones complained of to those set forth in an agreement known as Agreement A–1, which was made a part of the stipulation, and that a decree in the form also annexed to the stipulation might be entered. Thereafter this court entered its decree against RCA, General Electric and Westinghouse in the form annexed to the stipulation. Ten years later the decree was again under consideration by this court when a

Government motion to vacate it was denied. D.C., 1942, 46 F.Supp. 654, appeal dismissed on motion of the Government, 1943, 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161.

Upon entry of the decree the relationship between RCA, General Electric and Westinghouse in the radio fields was established as that set forth in Agreement A–1. Under the new relationship thus established, the creation and maintenance of which was a principal purpose of the decree, RCA was granted non-exclusive licenses under General Electric's and Westinghouse's patents in specified fields together with non-exclusive rights to grant sub-licenses under those patents to third parties, and the right to retain all royalties derived therefrom. General Electric and Westinghouse, on the other hand, each specifically reserved non-exclusive licenses under its own patents, specifically reserved the right to grant non-exclusive licenses to others thereunder, and received non-exclusive royalty licenses in certain fields from RCA under its patents, and from each other. General Electric and Westinghouse, however, did not obtain from RCA or from each other any right to grant sub-licenses under any of the patents of RCA or of the other in the fields of radio purposes. Thus RCA became, under Agreement A–1, the sole company which could license others in the radio fields under the patents of all three companies, although each could license others under its own patents.

The termination date specified in Agreement A–1 is December 31, 1954. However, the agreement provides that it and the licenses granted under it are to continue in force after that date, so far as concerns apparatus made or sold, or business done, under any patent under the agreement, so long as the patent remains unexpired. The sole question raised by the present motion is whether the licenses which RCA has thus been granted by Agreement A–1 to continue during the remaining lives of such patents after December 31, 1954 include the right to grant to third parties sub-li-

censes during that remaining period after December 31, 1954. General Electric and Westinghouse urge that this right is not given by Agreement A–1 and the Government takes the same view. RCA on the other hand contends that the agreement clearly does confer such sublicensing rights upon it for the remaining lives after December 31, 1954 of all patents of General Electric and Westinghouse comprehended by Agreement A–1. It is clear that the resolution of this question as to the rights of the parties after that date is of great importance to them and to the development of the electronics industry in which they are engaged. It is clearly in the public interest for this court to settle this question with respect to the operation and effect of the agreement approved by its decree.

■ The question is one of the meaning of a contract, Agreement A–1. The first recourse for its solution must, therefore, be to the language of the agreement itself. If the language is clear its meaning must be followed and there is no room for recourse to those considerations of public policy which would be relevant if the question were one of the reformation of the contract in the public interest. I, therefore, turn to the agreement. The provisions which directly bear on the question are the following:

### "Article IV.
#### "United States Government.

"General Company and Westinghouse Company each reserves non-exclusive licenses under its own patents only, to make and sell to the United States Government apparatus for radio purposes. General Company and Westinghouse Company each grants to Radio Corporation royalty-free licenses under its patents, including the right to grant non-exclusive licenses to others thereunder, to make and to sell to the United Staates Government apparatus for radio purposes. Radio Corporation grants to General Company and to Westinghouse Company respectively under all patents in re-spect of which it has the right to grant such licenses, non-exclusive licenses to make and to sell to the United States Government apparatus for radio purposes, and General Company and Westinghouse Company, respectively, agree, each as to its own sales, to pay to Radio Corporation a royalty of five per cent. (5%) of the net selling price of all apparatus sold by it under patents in respect of which it receives licenses from Radio Corporation, but not under its own patents, provided, however, that all sales to the United States Government on contracts closed or bids made prior to the date hereof shall be deemed to have been made under the Prior Agreements and not under this agreement.

### "Article V.
#### "Licenses Under United States Patents.

\*  \*  \*  \*  \*  \*

"Section 2. In the fields of radio purposes, General Company and Westinghouse Company each reserves non-exclusive licenses under its own patents only, and the right to grant non-exclusive licenses to others thereunder.

"Section 3. Subject to the reservations and conditions of Article IV hereof and of Section 2 of this Article V and to the licenses granted in Section 4 of this Article V, General Company and Westinghouse Company each separately grants to Radio Corporation all remaining rights and licenses, including the right to grant licenses to others, under its patents in the fields of radio purposes, and to collect and to retain all royalties and other considerations payable under any such license granted by Radio Corporation. General Company and Westinghouse Company agree that Radio Corporation shall be entitled to administer all licenses heretofore granted in the fields of radio purposes by them, or either of them separately, or togeth-

er with Radio Corporation, and shall be entitled to collect and retain for its own benefit all royalties collected in respect of apparatus sold after December 31, 1929. All royalties collected under such licenses in respect of apparatus sold prior to December 31, 1929, shall be divided between the parties as provided in Article XI of Agreement L.

\* \* \* \* \* \*

## "Article VI.
### "Scope of Licenses, Reservations, and Exceptions.

\* \* \* \* \* \*

"Section 7. All licenses herein granted which are expressed as merely non-exclusive, as distinguished from licenses reserved, do not include the right to the grantee to grant sub-licenses except to its subsidiaries subject to this agreement.

\* \* \* \* \* \*

"Section 10. Upon the termination of this agreement pursuant to the provisions of Article XIV hereof all licenses herein granted shall, during the terms of the several patents, issued or to be issued, in respect of which such licenses exist at the date of termination, continue unaffected and of the same scope and character herein expressed, so far as the grantor thereof has the right to grant such licenses for such terms; and such licenses shall not be limited by the term of this agreement.

\* \* \* \* \* \*

## "Article VII.
### "Patents Included in This Agreement.

"Section 1. Except as otherwise provided in this agreement, the licenses granted and agreed to be granted by any party to any other party are granted and agreed to be granted under all United States patents, which the granting party now owns or controls, or which it may acquire or under which it may have the right to grant licenses to others prior to the termination date hereof, determined as provided in Section 2 of Article XIV hereof, notwithstanding that the letters patent, in respect thereof may not be issued or filed until after said date.

\* \* \* \* \* \*

## "Article XIV.
### "Term and Termination.

"Section 1. This agreement and all licenses herein granted, shall continue in force until the termination date, as provided in Section 2 of this Article XIV, and thereafter, so far as concerns apparatus made or sold, or business done, under any patent hereunder, so long as that patent remains unexpired, and under any claim of that patent, so long as that claim remains valid. A claim shall be regarded as invalid when so declared by the Supreme Court of the United States, or when it has been so declared by any lower court unless appeal is taken or certiorari granted within the time provided by law. But if the patent is reissued, or, after having been declared invalid in one suit, is declared valid in another suit, it shall be regarded as valid until the Supreme Court of the United States decides otherwise, or until the parties definitely abandon their efforts to further sustain and enforce it.

"Section 2. The termination date shall be December 31, 1954."

■ It is apparent from the language of Article IV, Section 3 of Article V, Section 10 of Article VI, Section 1 of Article VII, and Section 1 of Article XIV, that RCA was intended to be granted by General Electric and Westinghouse licenses under all their patents acquired on or before December 31, 1954, in the fields of radio purposes, and that these licenses were to continue unaffected and of the same scope and character during the remaining terms of such of the patents covered thereby as should be unexpired on that date. This is conceded by

General Electric and Westinghouse. They urge, however, that the right conferred by them upon RCA to grant sub-licenses is a separate and independent right not included in the licenses granted to RCA and that it terminates on December 31, 1954. After reading the entire agreement I find myself in accord with RCA that its language clearly and unambiguously includes sub-licensing rights within the scope of the licenses which RCA receives under Section 3 of Article V of the agreement from General Electric and Westinghouse and that these sub-licensing rights accordingly survive the termination date of December 31, 1954 to the same extent as the licenses of which they are a part.

The basic provisions are those of Article IV and Section 3 of Article V. Under the first, General Electric and Westinghouse each grants to RCA "licenses under its patents, including the right to grant non-exclusive licenses to others thereunder". Under the second, the grant is of "all remaining rights and licenses, including the right to grant licenses to others." General Electric and Westinghouse argue that the clause "including the right to grant [non-exclusive] licenses to others" should be read as an independent grant of sub-licensing rights which is wholly separate and apart from the licenses which the immediately preceding portion of each sentence expressly grants to RCA. I cannot so read the language. On the contrary I think that the clause in question is intended to define the scope of the licenses which are thus granted and not to add rights in addition to those conferred by the licenses. There may be cases where the participle "including" should be read as the conjunction "and", but this is not one of them. Reference to the agreement as a whole makes this perfectly clear. For it discloses that the draftsmen had in mind two types of licenses, those which include the right to the grantee to grant sub-licenses and those which do not. This understanding is reflected in the language of Section 7 of Article VI and it appears throughout the agreement. Thus in many places in the agreement reference is made to "non-exclusive licenses" which under the definition contained in Section 7 of Article VI do not include sub-licensing rights. See, for example Article IV, and Sections 2, 4, 5, 6, 7, 14 and 17 of Article V. In a number of other places reference is made to licenses which do include such rights. For example in Article IV and Sections 3, 15 and 16 of Article V there are grants of licenses including the right to grant licenses to others.

It is true that in Sections 3 and 15 of Article V these grants are of all remaining rights and licenses, including the right to grant licenses to others. The fact that in two instances the grant is simply of licenses including the right to grant licenses to others while in the other two the grant is of all remaining rights and licenses including the right to grant licenses to others is in my opinion wholly without significance in the present connection. General Electric and Westinghouse seek to make much of this difference in language but I fail to find any indication in the agreement that in the one case the granted licenses are to include the right to sub-license others while in the other the right to sub-license others is to be regarded as a right granted independently of the license itself. Indeed the very fact that the granting clauses of Article IV and Section 3 of Article V disclose this difference in phraseology is strong evidence that no difference in meaning is intended. For the two grants are in pari materia, dealing with the same patents. It could hardly have been intended that a license under Article IV to make and sell to the Government should include a sub-licensing right, while a license under the same patent given by the same grantor to the same grantee under Section 3 of Article V should not. It is apparent, I think, that the reference to "all remaining rights" in Section 3 of Article V is included for a wholly different reason, namely, to make certain that the grantees receive all the rights of every kind represented by the patents in question

except those which the grantors have expressly reserved to themselves in Article IV and Section 2 of Article V.

There would be more force in the contention of General Electric and Westinghouse if the language were to read "licenses and all remaining rights, including the right to grant licenses to others." This language was not used, however, and it is evident that the draftsmen of the agreement did not intend to use the term "license" in the strict technical sense of a mere contractual immunity from suit for infringement or to make the technical distinction between rights and licenses under patents or between sub-licensing rights which are included in licenses and sub-licensing rights which are granted independently of licenses which General Electric and Westinghouse here contend for. Reading Section 3 of Article V as granting to RCA licenses which include within their scope the right to sub-license others appears to me to give the language its natural and logical meaning and one which is consistent with Article IV and the remainder of the agreement. It follows that so far as concerns the question here raised the sole purpose of the termination date, December 31, 1954, is to operate as a cut-off date after which new inventions by the parties shall not become subject to the agreement. I am satisfied, therefore, that the licenses which RCA receives under Section 3 of Article V from General Electric and Westinghouse include within their scope the right to grant licenses to others and that these sub-licensing rights accordingly will continue, under the provisions of Section 10 of Article VI and Section 1 of Article XIV, for so long a time after December 31, 1954 as the licenses themselves continue.

Moreover I think that the plain language of Agreement A–1 would require that these sub-licensing rights should thus continue even though Section 3 or Article V were to be construed, as General Electric and Westinghouse urge that it should be, as granting these rights to RCA independently of the licenses which that section grants. For it is to be ob-

served that under Section 1 of Article XIV it is not only licenses which shall continue in force after the termination date, December 31, 1954, but also "This agreement" itself "so far as concerns apparatus made or sold, or business done, under any patent hereunder". It thus appears that not only the licenses but also the other rights given by the agreement are to continue insofar as they relate to apparatus made or sold, or business done, under patents acquired prior to December 31, 1954. It would certainly appear that the right to sub-license under any such patent is such a right, particularly where as here the business of sub-licensing is a substantial part of the business done by RCA under the patents under which it has received licenses pursuant to the agreement.

The motion of General Electric Company will be denied.